UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ERIC BORG,

*Plaintiff,*

–against–

86TH AND 3RD OWNER, LLC, RELATED, LP,
BOVIS LEND LEASE, LMB, INC., D & F
MASON, INC. and DEL SAVIO
CONSTRUCTION CORP.,

*Defendants.*

08 Civ. 05913 (RJH)

**MEMORANDUM OPINION &
ORDER**

By joint stipulation approved by the Court on October 5, 2011, the parties to this action discontinued the litigation with prejudice subsequent to the signing of a monetary settlement in the amount of $11.5 million, reached after voluntary mediation.  After suffering a devastating injury in November 2007, the plaintiff, Eric Borg, retained the law firm of Barasch McGarry Salzman & Penson ("BMS&P") on February 20, 2008, and, represented by the firm, Borg filed a complaint in U.S. District Court for the Southern District of New York on June 30, 2008. Shortly thereafter, Borg discharged BMS&P on July 21, 2008.  *See* Aff. of Dominique Penson & Michael Barasch in Supp. of Amended Mot. to Apportion Attys.' Fees ("Penson & Barasch Aff.") at 2–3 (May 20, 2011), ECF No. 80.  Borg then hired the law firm Sacks and Sacks, LLP ("S&S") to represent him in the matter, with attorney compensation set at one-third of the ultimate recovery, *see* Retainer at 1, Exh. 1 to Penson & Barasch Aff., ECF No. 80-1, and S&S managed the case through settlement.[1]  At the time of its discharge by Borg, BMS&P "declined to seek immediate compensation" based on an hourly rate for work performed and instead

---

[1] The retainer agreement between the plaintiff and S&S, the incoming firm, has not been submitted as part of the record.  However, neither party disputes that the contingency fee remained at one-third of recovery once S&S took over the case.

"elected to receive a share of the contingency fee, to be calculated based on the firm's proportionate share of work performed on the case." *Id.* at 3.  After the parties finalized the settlement, BMS&P and S&S met to resolve the apportionment of fees, but they could not reach an agreement and determined that judicial intervention was necessary to end the dispute.  Six months after the parties filed the stipulation of discontinuance, BMS&P filed a motion to apportion attorneys' fees seeking 20% of the $3,833,333.00 constituting the total of the contingency fee based on the settlement.  *See* Mem. of Law in Supp. of Mot. to Apportion Attys.' Fees ("BMS&P Mem.") at 10 (May 19, 2011), ECF No. 78.  That motion is now before the Court, and is opposed by S&S, which argues that BMS&P's work on the case constituted only 1% "of the meaningful" and 0% "of the challenging" legal work in this matter and that, accordingly, BMS&P should be awarded no more than 2.5% of the total attorneys' fees earned. Mem. of Law in Supp. of Sacks and Sacks' Application to Apportion Attys.' Fees ("S&S Opp.") at 1 (June 24, 2011), ECF No. 83.

After reviewing the parties' submissions as to the fee dispute, and for the reasons given below, the Court determines that, of the total $3,833,333.00 in attorneys' fees available here, S&S is entitled to $3,526,666.00 —roughly 92% of the attorneys' fee in this matter—and BMS&P is entitled to $306,667.00—roughly 8%—as fair compensation for their work performed on behalf of the plaintiff in the underlying case.

## BACKGROUND

The case underlying this fee dispute stems from a devastating accident at a construction site that occurred on November 27, 2007.  The two law firms that contest this motion dispute many facts relevant to the Court's inquiry here, but at least two central events are clear:  First, the plaintiff, a steel laborer, suffered severe, traumatic brain injuries when struck on the head by

a cinder block that fell more than fourteen stories from an overhanging scaffold at a construction site in the Bronx, New York.  *See* Penson & Barasch Aff. at 2; Decl. in Supp. of Incoming Counsel Sacks and Sacks' Application for an Equitable Apportionment of Attys.' Fees ("First Sacks Decl.") at 1 (June 24, 2011), ECF No. 82.  Second, the plaintiff settled his case with the defendants for $11,500,000.00, yielding a contingent attorneys' fee of $3,833,333.00.  *See* Penson & Barasch Aff. at 3, 19; First Sacks Decl. at 1–2.

The firms have submitted declarations attesting to various factual events relating to each firm's representation of the plaintiff in this matter.  The Court now summarizes the competing versions of events presented therein.

<u>Retention of, and Investigation & Drafting of the Complaint by, BMS&P</u>

In its filings related to the instant motion, BMS&P represents that on February 14, 2008, the firm received a phone call from the plaintiff's brother, Emil Borg, advising it that the plaintiff had been badly injured while working at a construction site.  *See* Penson & Barasch Aff. at 5. Days later, both Borgs—Eric, the plaintiff, and Emil, his brother—and the plaintiff's girlfriend visited the office of BMS&P for a meeting.  *See id.*  The plaintiff informed the firm that he was interviewing several attorneys; several days later, he advised BMS&P that he had selected the firm to represent him.  *See id.*  On February 20, 2008, Dominique Penson traveled to Eric Borg's home in New Jersey to interview him about the case, collecting details about the accident, his injuries, and potential witnesses.  *See id.*; *see also* Construction Worker Labor Law Intake, Exh. 2 to Penson & Barasch Aff., ECF No. 80-2.  Penson met again with the plaintiff on April 2, 2008 to discuss Eric Borg's medical condition.  *See* Penson & Barasch Aff. at 5; *see also* Eric Borg 4/2/08 — In Office [Notes], Exh. 3 to Penson & Barasch Aff., ECF 80-3.

In reciting facts related to its follow-up interviews with prospective witnesses, BMS&P makes several representations regarding the actions of S&S prior to the plaintiff's retention of BMS&P—representations that, as the Court will discuss, S&S vehemently contests.  BMS&P states that at Penson's New Jersey meeting with the plaintiff, the plaintiff gave her four signed witness statements from "employees who were at the work site" dated November 28, 2007. Penson & Barasch Aff. at 6; *see also* Witness Statements, Exh. 4 to Penson & Barasch Aff., ECF No. 80-4.  According to BMS&P, at the New Jersey meeting the plaintiff informed Penson that the witness statements—along with "photographs of the accident site taken within several hours of the accident, and a 'donation' of $7,500 for Mr. Borg"—had been delivered by "the Sacks firm[,] . . . unbidden by Mr. Borg or his family," to the plaintiff's hospital room in the days following the accident.  Penson & Barasch Aff. at 6.  BMS&P reiterates in its filings that, "according to what Eric and Emil Borg told [the] firm," S&S had taken the photographs and conducted the witness interviews "not at the request of the Borgs or anyone else with authority to speak for Mr. Borg."  *Id.*; *see* E-mail from Michael Barasch to Barry Salzman & Dom Penson dated Feb. 14, 2008 ("Barasch E-mail"), Exh. 5 to Penson & Barasch Aff., ECF No. 80-5.

In response, S&S submits the declaration of the plaintiff, who appears to affirm that his brother, Emil Borg, "gave Sacks and Sacks permission to conduct an investigation" in the days following the accident.[2]  Aff. of Eric Borg ("Eric Borg Aff.") at 2, Exh. 1 to First Sacks Decl.,

---

[2] The relevant sentence in the Borg affidavit reads:  "I was informed by my brother, Emil, on the date of the accident and gave Sacks and Sacks permission to conduct an investigation, which they immediately did and handed over same to my family."  Eric Borg Aff. at 2.  The grammatical issues in the quoted sentence make interpretation of the sentence somewhat problematic, as it is unclear from the words therein *who*—the plaintiff or his brother—gave permission to S&S to conduct an initial investigation.  However, the plaintiff at the relevant time period was in a medical coma, and S&S asserts—relying on Eric Borg's affidavit—that "Emil [Borg] gave S&S permission to conduct a preliminary investigation immediately after the accident."  S&S Opp. at 2.  The Court therefore interprets the statement in the Borg affidavit as representing that, at some point, Emil Borg informed the plaintiff that he had authorized S&S to conduct the post-accident investigation.  While the Court notes that such an assertion, if offered to prove the veracity of the claim itself, would likely be considered hearsay, that recitation of events is further corroborated by three other declarations to be discussed above.  The Court leaves further discussion of the

ECF No. 82-1.  According to Frank Torres, a witness to the accident, on November 27, 2007, Torres "contacted [S&S], who ha[d] represented many of [his] friends in the past, and asked them to meet [him] at the hospital to undertake an investigation for Mr. Borg."  Aff. of Frank Torres ("Torres Aff.") at 1, Exh. B to Sur-Reply Mem. in Supp. of Sacks and Sacks' Application to Apportion Attys.' Fees ("S&S Sur-Reply"), ECF No. 89.  Torres further represents that lawyers for S&S "informed [him] that they could not do any investigation without the consent of a family member [of Eric Borg]," and that Torres then introduced the lawyers to Emil Borg, "who gave them permission to conduct an investigation on behalf of Eric."  *Id.*  Emil Borg, the plaintiff's brother, confirms—in a one-sentence affidavit—that he gave such permission to S&S, *see* Aff. of Emil Borg ("Emil Borg Aff.") at 1, Exh. A to S&S Sur-Reply, and Kenneth Sacks attests to both Torres's initial contact on the night of the accident and Emil Borg's investigation authorization, *see* Decl. of Kenneth Sacks ("Second Sacks Decl.") at 1–2, Exh. C to S&S Sur-Reply.  BMS&P refutes this account, suggesting that, given New York's Rules of Professional Conduct prohibit the solicitation of personal-injury plaintiffs so soon after an accident, "[n]o experienced attorney would fail" to confirm the requests of Torres and Emil Borg in writing.  Reply Aff. of Dominique Penson ("Penson Reply Aff.") at 10 (July 22, 2011), ECF No. 85.

S&S describes its initial investigation as consisting of Kenneth Sacks and Mike Weir, an S&S associate, visiting the job site and interviewing various witnesses who related the facts of Eric Borg's accident.  *See* First Sacks Decl. at 3.  They also took photographs of the accident scene, and collected a replica of the cinder block that fell onto the plaintiff's head.  *See id.*  S&S represents that it then turned over the contents of its investigation to the plaintiff's family.  *See id.*  As for the $7,500 "donation" mentioned by BMS&P, S&S represents that Emil Borg

credibility of the affidavits and the assertions made therein to the Discussion section of this Memorandum Opinion & Order.

informed Kenneth Sacks that the plaintiff's "fellow workers were creating a pool of funds to support him," and Kenneth Sacks then "made a donation as well." *See* S&S Sur-Reply at 2; *see also* Second Sacks Decl. at 2.

Despite eventually coming into possession of the photographs and witness statements taken by S&S, BMS&P conducted its own interviews of the four identified witnesses, and several more, because the firm had "no personal knowledge of the accuracy or authenticity" of the prior statements. *See* Penson & Barasch Aff. at 7.  The firm made further inquiries and preparations as well:  It "dispatched an investigator to the construction site to take photographs of the site"; sent claim letters to potential defendants; contacted S&S to receive materials related to its post-accident investigation; obtained the plaintiff's medical and employment records from various sources; sent the S&S-acquired witness statements and photographs to the Occupational Safety and Health Administration ("OSHA") in order to assist its investigation into the accident; and acquired the OSHA report when completed. *See id.* at 7–9.

BMS&P also details its additional efforts in this matter.  The firm represents that it retained "an experienced certified site safety manager[] to serve as an expert on the case." *Id.* at 10.  The firm also conducted "extensive legal research" in order to "prepare [the] drafting [of] the complaint, and for an eventual summary judgment motion," identifying "some 17 labor law cases [the firm] believed would be important in an eventual summary judgment motion." *Id.* at 11.  And the firm "analyzed the issue of where to bring suit on Mr. Borg's behalf," researching the question of venue for propriety and for strategic purposes related to the impending litigation. *Id.* at 12–13.  Finally, BMS&P prepared and filed the initial complaint in this matter in federal court and served it upon all defendants. *See id.* at 14–17.  BMS&P, however, does not provide an estimate of the hours it expended on the case through filing of the complaint, as "[b]ecause

[BMS&P] represented Mr. Borg pursuant to a contingency fee agreement, it did not keep time records for work performed in the case." *Id.* at 4.

S&S takes issue with BMS&P's characterization of its own work leading up to the filing of the complaint.  Kenneth Sacks contends that BMS&P's claim to have conducted extensive legal research "cannot possibly be true," as the firm's "eight-page complaint contains straightforward, garden-variety claims that any lawyer reasonably experienced in cases like Mr. Borg's could draft in, at most, a couple of hours, without needing to perform any real research." First Sacks Decl. at 4.  In addition, Kenneth Sacks claims that when S&S took over the case, "there was no evidence of 'extensive' research in the file," and it contends that BMS&P's initial complaint "neglected to include" various live claims on behalf of the plaintiff.  *See id.*  Kenneth Sacks states in his declaration that "virtually all" of BMS&P's pre-filing work "could have been performed by paralegals or other non-lawyers," *id.*, and S&S argues that the entirety of BMS&P's work could not have taken more than fifteen hours, *see* S&S Opp. at 3.

<u>Discharge of BMS&P & Retention of S&S</u>

Shortly after the filing of the complaint, the plaintiff discharged BMS&P.  BMS&P represents that when the plaintiff informed the firm of his decision, he explained that it resulted in part from members of his union and S&S itself "urging him to reconsider his decision not to hire" S&S.  Penson & Barasch Aff. at 17.  The firm asserts that the plaintiff told it that S&S had "done many good things for [the plaintiff's] union" and that "perhaps he had been too hard on [S&S] when he turned away the firm" initially.  *Id.* at 17–18.  BMS&P also represents that the plaintiff informed it that S&S "had told him that [BMS&P] had made a mistake in bringing the case in federal court[] rather than state court."  *Id.* at 18.

The submissions of S&S directly contradict BMS&P's account of its dismissal by the plaintiff. S&S submits the affidavit of Eric Borg, in which he attests that "[t]he statements attributed to me by Mr. Barasch and Ms. Penson" in the BMS&P Mem. and the Penson & Barasch Aff., including "the allegation that Sacks and Sacks strong armed me into choosing their firm," are "complete lies." Eric Borg. Aff. at 1. He further states that "[t]he reason that I fired Mr. Barasch and Ms. Penson is because they were unable to answer any questions that I had, and filed in Federal Court without my permission." Eric Borg Aff. at 1. And S&S further represents that "[n]o one from the Sacks firm had any contact with anyone from Mr. Borg's family for seven months until Mr. Borg discharged the Barasch firm." S&S Sur-Reply at 2.

In its Reply Affirmation, BMS&P disputes S&S's account. Penson represents that she "personally discussed the venue issue with Mr. Borg prior to filing suit in federal court," and that she explained her firm's reasons for choosing federal court and, afterward, "Mr. Borg voiced no opposition to bringing the case in federal court." Penson Reply Aff. at 8. Penson also reiterates that "after discharging [BMS&P], [the plaintiff] did tell [her] that Kenneth Sacks told him [BMS&P] had erred in bringing the action in federal court[ and] that the case should have been brought in Bronx County." *Id.* BMS&P also suggests that S&S's version of events—that, entirely properly and at the request of the plaintiff's family, it conducted an initial investigation and turned over the results, but was not chosen by the plaintiff to represent him—"is, in a word, incredible." *Id.* at 11. The plaintiff, Penson contends, "would not have spurned [S&S] first, hired another firm, and then done his due diligence, leading him back to [S&S]." *Id.* Penson argues that, therefore, "[t]he only reasonable inference is that Eric Borg spurned [S&S] because its investigation was unauthorized and its solicitation of him at the hospital was unbidden and unwelcome." *Id.* All of these conflicting accounts, BMS&P argues, demonstrates "the need for

discovery and a hearing" into the circumstances surrounding S&S's initial investigation, the discharge of BMS&P, and the hiring of S&S after the complaint in the matter had been filed. *Id.* at 12.

Work of S&S

S&S describes its own work on the plaintiff's case as involving "thousands of hours" of effort. S&S Opp. at 3. It represents that S&S made all court appearances on behalf of the plaintiff, interacted with defense counsel (which, it says, BMS&P never did), spoke "constantly to the client and his family," conducted all pre-trial discovery, hired experts, "performed all substantive investigations," drafted summary judgment papers in preparation for such a motion, and prepared for and attended the mediation session that led to the eventual $11.5 million settlement. *Id.*; *see* First Sacks Decl. at 5–11. S&S "did 100% of the discovery and made all of the court appearances in this action," *see id.* at 6, and defense counsel calls discovery in this matter "extensive," *see* Aff. of Donald Derrico ("Derrico Aff.") at 2, Exh. 7 to S&S Opp., ECF No. 82-7. S&S details, with specificity, many of its activities in preparation for trial, particularly with respect to its review of discovery documents and its conducting and defending of depositions. *See* First Sacks Decl. at 6–8. Kenneth Sacks asserts that all of S&S's preparation and work in this phase of the case was successful, as S&S implemented a strategy designed to demonstrate that the "defendants had manufactured their [defense-to-liability] position *ex post facto* without supportive evidence," and "S&S's questions caused the deponents to consistently contradict each other as to key elements of the defendants' recalcitrant worker defense." *Id.* at 7. S&S further "worked with [the plaintiff] extensively over many hours on multiple days" before each of the plaintiff's two depositions. *Id.* S&S also drafted and filed a motion for summary judgment, the strength of which Kenneth Sacks asserts caused the defendants to enter into the

— 9 —

ultimately fruitful settlement discussions.  *See id.* at 8.  The firm analyzed potential damage awards by interviewing expert witnesses, sorting through the plaintiff's medical records, and meeting with doctors and psychiatrists to discuss the plaintiff's life-care needs and future economic losses.  *See id.* at 9.  It then prepared, with "hundreds of hours of work," for mediation, and later "took substantial time" to draft a comprehensive settlement agreement that would provide lump-sum payments as well as annuities for the plaintiff to ensure for lifetime medical care.  *Id.* at 11.  Finally, S&S achieved, after mediation, a settlement of $11.5 million for the plaintiff—far exceeding the plaintiff's avowed expectation of a recovery of roughly $2 million.[3] *See id.* at 10–11.

To round out its version of events, S&S submits the affidavit of Donald Derrico, counsel for the defendant, which states that the matter "settled when it did, for the amount that it did, as a result of the efforts of Mr. Sacks and his firm."[4]  Derrico Aff. at 2, Exh. 7 to S&S Opp., ECF No. 82-7.  And Kenneth Sacks asserts that "it is plain that S&S did more than 99% of the relevant legal work in this case."  First Sacks Decl. at 12.  Indeed, BMS&P itself acknowledges S&S's substantial work in this matter.  It states that "Sacks handled the entirety of the documentary exchange in this case," "prepared a summary judgment motion," and "negotiated a significant settlement in this case."  Penson & Barasch Aff. at 19.  However, while BMS&P acknowledges that "[b]y sheer volume, . . . the Sacks firm did the majority of work in the case," it contends that "favorable liability laws" and "a profound injury to a young man with catastrophic economic consequences" meant the case had an extraordinarily high "inherent value."  *Id.* at 19–20.

---

[3] In the initial complaint filed by BMS&P, the plaintiff had simply asserted that damages exceeded $75,000.  *See* Complaint at 7–8 (June 30, 2008), ECF No. 1.  BMS&P disputes that $2 million would have been a reasonable settlement, given the extent of the plaintiff's injuries, and calculates that "using only defendants' figures" submitted to the mediator, the case was valued "between 8.7 and 11.7 million dollars."  Penson Reply Aff. at 15 (emphasis removed).

[4] BMS&P contends that Derrico's affidavit is "meaningless," as it does nothing to demonstrate that S&S "obtained a settlement above the value of the case."  Penson Reply Aff. at 17.

BMS&P further states that "Sacks did not have to do a pre-trial order, it did not have to prepare for trial, it did not have to prosecute an appeal, and there was no motion practice, save for the summary judgment motion that was never opposed."  *Id.* at 6.  Therefore, it estimates, S&S's work constitutes just 75% of the attorney contribution to the case on behalf of the plaintiff.  *See* Penson & Barasch Aff. at 20.

## DISCUSSION

### I.  Jurisdiction

The Second Circuit has stated that "[w]henever a district court has federal jurisdiction over a case, it retains ancillary jurisdiction after dismissal to adjudicate collateral matters such as attorney's fees."  *In re Austrian & German Bank Holocaust Litig.*, 317 F.3d 91, 98 (2d Cir. 2003).  "[A]ncillary jurisdiction is aimed at enabling a court to administer justice within the scope of its jurisdiction," *Stein v. KPMG, LLP*, 486 F.3d 753, 760 (2d Cir. 2007) (internal quotation marks omitted), and is intended "'to permit disposition of claims that are, in varying respects and degrees, factually interdependent by a single court, and . . . to enable a court to function successfully, that is, to manage its proceedings, vindicate its authority, and effectuate its decrees,'" *Garcia v. Teitler*, 443 F.3d 202, 208 (2d Cir. 2006) (quoting *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 379–80 (1994)).  "The most common exercise of ancillary jurisdiction is, probably, to resolve fee disputes between a party and its attorney arising in litigation in which the attorney represented the party."  *Stein*, 486 F.3d at 760.  A court may also rely on ancillary jurisdiction to resolve a dispute among attorneys regarding the proper apportionment of fees earned during a case within the court's jurisdiction, even if the dispute does not directly involve a party to the dismissed action.  *See, e.g.*, *Wagner & Wagner, LLP v. Atkinson, Haskins, Nellis, Brittingham, Gladd & Carwile, P.C.*, 596 F.3d 84, 90 (2d Cir. 2010).

Therefore, the Court exercises its discretion to resolve the fee dispute between the law firms which represented the plaintiff in the underlying action.

II. Governing Law

The law firms agree on the legal framework to be used in determining the proper fee amounts to be awarded to each in resolving the instant motion.  Several courts in this district have concluded that courts should apply state law governing attorneys'-fee matters when considering fee disputes in diversity cases, *see, e.g.*, *RLS Assocs., LLC v. United Bank of Kuwait PLC*, 464 F. Supp. 2d 206, 213 (S.D.N.Y. 2006) (citing *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 259 n.31 (1975)), and the Court agrees that "it is obvious and uncontested that New York state law should control" the analysis here, S&S Opp. at 3.

Under New York law, when a client discharges an attorney without cause, "the attorney is entitled to recover compensation from the client measured by the fair and reasonable value of the services rendered[,] whether that be more or less than the amount provided in the contract or retainer agreement."  *Lai Lin Cheng v. Modansky Leasing Co.*, 73 N.Y.2d 454, 457–58 (1989).  When the compensation dispute is between the client and outgoing counsel, they may agree that the outgoing attorney should receive a fixed-dollar amount for services rendered in *quantum meruit* "or, in the alternative, they may agree that the attorney . . . will receive a contingent percentage fee determined either at the time of substitution or at the conclusion of the case."  *Id.* at 458.  However, the New York rule differs when the fee dispute is between outgoing and incoming counsel.  The outgoing attorney may elect to receive a fixed-dollar sum in *quantum meruit*, but also "has the right to elect a contingent percentage fee based on the proportionate share of the work performed on the whole case."  *Id.*  That percentage is most properly determined at the close of the case, for the perhaps-obvious reason that factors informing a

— 12 —

determination of the value of each attorney's work can be better ascertained upon completion of the litigation.  *See id.*; *accord Weinhold v. Witte Heavy Lift, Inc.*, No. 90 Civ. 2096, 1993 WL 147535, at *2 (S.D.N.Y. May 6, 1993).

According to New York courts, those factors are, essentially, four-fold: (1) "the time and labor spent by each" attorney or firm, as well as "the actual work performed" by each; (2) "the difficulty of the questions involved" and, related, "the skill required to handle the matter"; (3) each "attorney's skills and experience"; and (4) "the effectiveness of counsel in bringing the matter to resolution."  *Buchta v. Union-Endicott Cent. Sch. Dist.*, 296 A.D.2d 688, 689–90 (N.Y. 3d Dep't 2002); *accord Foppiano v. City of N.Y.*, No. 00 Civ. 7968, 2002 WL 31202716, at *4 (Sept. 25, 2002).  Neither party disputes that those factors are the proper foci of the Court's analysis here.  *See* BMS&P Mem. at 2–3; S&S Opp. at 3.

III. Application

The Court now turns to an analysis of the factors to be considered in apportioning fees in this matter.  The Court's inquiry is not a scientific one; it will consider each factor individually and, after doing so, will consider the cases cited by the firms in their papers in order to situate the totality of the Court's consideration of those factors within past case law.  After an overall evaluation of these issues, the Court, in its sound discretion, will determine the appropriate fee awards for each firm.

A. Factors

1. Time & Labor / Actual Work Performed

As to time and labor expended on "actual work" this matter, it is clear that S&S spent far more effort and hours working on the plaintiff's case.  S&S estimates that its staff's work in this case involved "thousands of hours," *see* S&S Opp. at 3, and while BMS&P challenges that

— 13 —

estimate, *see* BMS&P Reply at 8 ("[T]he actual number of hours [S&S] put into the *Borg* case is probably much closer to 230 than 'thousands.'"), it does not dispute that S&S did all of the work it claims to have done.  Even excluding S&S's initial investigation—the details of which are disputed and which, in any event, took place before the plaintiff retained S&S, *see* BMS&P Mem. at 8—S&S handled the entirety of the case aside from filing the complaint.  The firm conducted all discovery, hired experts, performed additional substantive investigations, drafted motion papers in advance of trial, and prepared for and represented the plaintiff in the mediation session which led to the settlement of the matter.[5]  *See* S&S Opp. at 3.  By contrast, BMS&P states that it cannot even estimate the amount of time it spent on the case, *see* Penson & Barasch Aff. at 4, and by its own representations, it only conducted the initial investigation of the accident, interviewed witnesses, compiled records, accumulated legal research, and prepared an eight-page complaint, *see id.* at 8.  While the Court does not credit S&S's estimate that the sum of BMS&P's work could only have taken the firm a total of fifteen hours—it would seem reasonable to conclude the hours spent on the investigation itself, let alone research and drafting, must have taken more than that amount—it is certain that BMS&P's total hour expenditure is but a small fraction of the total work performed on behalf of the client in this case.  S&S also rightly notes that BMS&P never even interacted with defense counsel in this matter.  *See* S&S Opp. at 2.  Certainly, BMS&P might have been able to show, through timekeeping records, that it spent far more time on the case than can be estimated from its output and self-descriptions; however, while its failure to keep time records in a contingency case might be "understandable," Person & Barasch Aff. at 4, the absence of time records—and of even an estimate of time spent; S&S did not submit time records either, but did estimate its hours—limits the Court's ability to credit

---

[5] BMS&P represents that it did not have a full opportunity to review all of S&S's discovery in order to evaluate how much work was done in that phase of the case.  *See* Penson Reply Aff. at 4.  However, BMS&P does not dispute that, whatever the amount of discovery conducted, all of it was handled by S&S.  *See* Penson & Barasch Aff. at 19.

BMS&P with time spent that departs significantly from the Court's evaluation of the time ordinarily spent on similar tasks. *Cf. Louima v. City of N.Y.*, No. 98 Civ. 5083, 2004 WL 2359943, at *3 (E.D.N.Y. Oct. 5, 2004) (rejecting a firm's claim to have worked for hundreds of hours based on consideration of duties only, where firm did not submit time records substantiating its claim). Therefore, the Court concludes that this factor heavily favors S&S.

### 2. Difficulty of Questions & Skill Required

In the Court's view, there is also a substantial disparity in the difficulty of the questions faced by each firm here, as well as the skill required to confront them. BMS&P faced the initial tasks common to the start of any legal representation in a civil lawsuit on behalf of a personal-injury plaintiff: The firm conducted interviews with witnesses, collected forms relating to the plaintiff's medical records and injuries, retained an expert, conducted legal research, discussed litigation strategy regarding claims, jurisdiction, and venue, and prepared an eight-page federal complaint. To be sure, those are not simple tasks; however, their difficulty pales in comparison to the tasks undertaken by S&S. A much larger amount of preparation is required to properly defend a plaintiff in depositions, take depositions from defense witnesses, prepare a summary judgment motion in advance of trial, sift though discovery documents and make discovery requests, and—perhaps most importantly here—prepare for, and conduct, a mediation session—especially one that, in anyone's view, turned out to be highly successful here. In the Court's view, the tasks undertaken by S&S were significantly more challenging than those conducted by BMS&P, and this factor weighs, like the first, significantly in S&S's favor.

### 3. Attorney Skill & Experience

As S&S acknowledges, "[t]his is a difficult factor to weigh." S&S Opp. at 6. In arguing that its experience is superior to that of BMS&P, S&S represents that searches for "labor law" on

the Westlaw database, in conjunction with each firm's name, yields 153 reported decisions for
S&S and just 48 for BMS&P. *See* S&S Opp. at 6. The Court has not been able to replicate these
search results; however, even if it were able to do so, the Court has doubts that such a method is
an appropriate way to evaluate a law firm's "experience, ability and reputation," *In re Ury*, 108
A.D.2d 816, 817 (N.Y. 2d Dep't 1985) (internal quotation marks omitted). The facts of this
case—which settled before trial or motion practice—bear out such skepticism. The Court is not
satisfied from any of the firms' submissions that anything of substance has been offered to allow
the Court to make any findings, in one firm's favor or the other, on the matter of firm experience
and skill in matters such as the underlying case. The Court therefore determines that this factor
helps neither firm in the Court's balancing inquiry.

### 4. Quality of Work / Effectiveness of Counsel in Resolving Matter

The firms quibble over some details about the quality of each other's work. *Cf.*
*Foppiano*, 2002 WL 31202716, at *4 ("Perhaps inevitably in this sort of 'zero sum' game, both
firms have criticized aspects of each other's work."). For example, S&S contends that BMS&P
"neglected to include in its complaint that defendants had violated several applicable provisions
in Rule 23 of the Industrial Code of the State of New York," an error S&S says it "was later able
to fix . . . when it served interrogatories on the defendants." S&S Opp. at 4. S&S also labels
BMS&P's choice to file suit in federal court, rather than state court, "unconventional," casting
doubt on the strategic wisdom of that choice. S&S Sur-Reply at 4. For its part, BMS&P argues
that S&S made other errors, including discounting the multiplying effect of N.Y. C.P.L.R. 50-B,
which BMS&P argues could have resulted in a much higher settlement for the plaintiff. *See*
Penson Reply Aff. at 20–21. It also contends that S&S's claims to having prepared a strategy

that thwarted the defendants' possible defenses is "completely unfounded," as those defenses were not "remotely feasible under the controlling case law." *Id.* at 21–22.

In the Court's view, both firms did work of high quality during their phases of representation in this matter.  Questions of legal strategy—including the decision about where to file a case, and which claims to bring—can always be second-guessed.  But despite accusations from each side, neither firm submits a concrete basis to permit the Court to conclude that either firm strategically erred in a significant respect.  As a result, the Court takes no position on which firm has the better of the arguments regarding legal strategy.  The Court's conclusion on this score is based in part on the fact that the complaint filed by BMS&P was never amended, and that complaint laid the foundation for the eventual settlement.  That S&S, once representing the plaintiff, never amended the complaint undermines its argument that BMS&P's alleged "neglect[]" in failing to allege various regulatory violations had a significant impact on the case.  And that BMS&P filed in federal, rather than state, court—a decision that S&S criticizes repeatedly in its submissions related to the instant motion—seems to have had little effect on the outcome; in any event, S&S has not demonstrated with anything beyond mere allegation that such a choice was objectively unwise.  Indeed, it is remarkable that, despite the cross-allegations the firms lodge against one another, the case appears to have proceeded smoothly and straightforwardly, from investigation to settlement, in all respects.  Though BMS&P, somewhat belatedly, contends that "the upside of Mr. Borg's case was actually much greater" than the $11.5 million settlement, Penson Reply Aff. at 14, it seems beyond doubt to the Court that the settlement was at the very least within the upper range of potential recoveries.  Thus, despite both firms' arguments that each firm could have adopted different tactics that might have been

more successful, it is not apparent to the Court from any of those arguments that either firm performed inadequately in its duties.

Turning to the firms' relative effectiveness in bringing the case to a conclusion, the Court does credit, to some extent, BMS&P's claim that it "developed" "[m]any of the facts," Penson & Barasch Aff. at 19, that were later relied upon by S&S in its prosecution of the case.  Leaving aside S&S's initial investigation—which, regardless of which version of events is accepted, did not occur as part of S&S's actual representation of the plaintiff—there is no doubt that BMS&P's pre-complaint work proved valuable to the outcome here.  However, the development of the initial facts and the filing of the complaint were but the start to two years of litigation by S&S.  BMS&P never even interacted with defense counsel, let alone set the table for settlement discussions.  Even accepting BMS&P's contentions that some of the documents supporting S&S's arguments as to its "outstanding" work in the case are unreliable or irrelevant, *see, e.g.*, Penson Reply Aff. at 6 (casting doubt on the foundation of statements in Eric Borg's affidavit, including his opinion that "Sacks and Sacks is entitled to, at a minimal [sic], 95%, if not more, of the attorneys['] fees"), the fact remains that S&S handled the matter for more than two years after the termination of BMS&P's representation, which lasted roughly one month and extended only through the filing of the complaint.  It seems obvious to the Court that when comparing each firm's "effectiveness," as required here, S&S comes out far ahead of BMS&P.  That is not to say that S&S was more effective in prosecuting its duties than BMS&P was in prosecuting its own; it simply refers to the fact that S&S's duties were far more crucial to the eventual settlement.  Therefore, the Court concludes that the fourth and final factor under consideration strongly favors S&S.

B. Case Law

Both firms argue that New York case law supports their assessments of the relevant comparison of the work performed by them in this case.  The Court has examined those decisions and concludes that, while they are generally helpful examples of approaches courts have taken to examining the relative contributions of law firms in different cases, the only clear lesson to be taken from them is that there is no fixed pattern that decisions in this context must follow.  The Court's discretion in this area is broad, and each case presents its own circumstances that command a different result.  *See Foppiano*, 2002 WL 31202716, at *5 ("Scientific precision is, of course, impossible in determining how to allocate a contingency fee.").  In any event, the Court discusses several of those cases now.

Case law establishes that outgoing firms that file complaints and participate in some amount of discovery generally recover between 10% and 25% of an eventual attorneys' fee. First, in *Foppiano v. City of New York*, a personal-injury plaintiff who suffered two separate accidents hired the firm of Friedman & James ("F&J") on a contingent-fee basis shortly after the first incident occurred.  *See* 2002 WL 31202716, at *1.  F&J filed a complaint in the matter relating to the first injury, and the plaintiff returned to work.  *Id.*  As the parties conducted fact discovery, the second, more serious, accident occurred, and the parties and the court agreed that the first action would be discontinued without prejudice to make way for the filing of a second action encompassing both incidents.  *Id.*  The parties agreed that the discovery taken to that point was to constitute the "nonmedical fact-based discovery" in the forthcoming second action.  *Id.* Before the second action was filed, however, the plaintiff discharged F&J and hired Schneider, Kleinick, Weitz, Damashek & Shoot ("SKW") to represent him.  *Id.* at *2.  SKW filed an amended complaint in the new action encompassing both accidents, and the parties proceeded to

take medical discovery as well as limited additional fact discovery.  *Id.*  Eventually, the parties

settled the matter before trial for the sum of $2 million.  *Id.*  The court awarded F&J 25% of the

eventual attorneys' fee, and SKW 75%.  *Id.* at *5.  F&J's award was based on the fact that it

"spent considerable time communicating with the City with regard to the payment of Foppiano's

medical expenses," referred the plaintiff to a medical specialist, and filed the first complaint.  *Id.*

at *2.

In *Buchta v. Union-Endicott Central School District*, three firms consecutively

represented the plaintiff.  *See* 745 N.Y.S.2d at 145.  The first firm conducted an initial

investigation—including witness interviews, site photographs, and the collection of medical

records—and filed a notice of claim, and it further prepared an initial settlement proposal; the

second firm conducted all discovery—including multiple depositions and the retention of an

economic expert—and filed a note of issue; and the third firm prepared the case for trial over

several years, and ultimately achieved a significant settlement to resolve the case.  *See id.*  The

Third Department concluded that the firms were respectively entitled to 10, 25, and 65 percent of

the total attorneys' fee.  *Id.* at 146.

Next, in *Davis v. NBS Trucking, Ltd.*, No. 09 Civ. 919S, 2010 WL 5072139 (W.D.N.Y.

Dec. 7, 2010), the court awarded 20% of a contingency fee to an outgoing attorney who had

handled a large portion of the initial phase of the case, including the retention of a private

investigator, the collection of medical records, communication with a no-fault insurance provider

to ensure that the plaintiff immediately began receiving benefits, discussions with opposing

counsel, attendance at a hearing before the Workers' Compensation Board, and the filing of a

notice of claim.  *See id.* at *1.  The incoming counsel in *Davis* received 80% of the contingency

fee based on its preparation of a medical summary, investigation of the defendant, preparation of

the summons and complaint, conduction of discovery, attendance in court, attendance at depositions, preparation for and attendance at mediation, filing of a motion for summary judgment, and negotiation of an eventual settlement. *See id.* Because the second firm had "invested substantially more time" in the case, on "significantly more substantive legal work," and "effectively resolved [the] matter expeditiously with a highly favorable settlement for [the] plaintiff," the court concluded that the incoming firm was entitled to 80% of the fee. *Id.* at *2.

The case of *Cruz v. Olympia Trails Bus Co.*, No. 99 Civ. 10861, 2005 WL 3071473 (S.D.N.Y. Nov. 14, 2005), is also instructive. There, the plaintiff's first counsel represented her for a total of three months, and the court concluded that it "did little more than draft [and file] a fairly simple complaint." *Id.* at *6. The first firm also "sent out 'form' letters requesting medical records, bills and other information from various entities." *Id.* at *4. The court concluded that the first firm's contribution constituted twenty percent of the total hours expended by the two firms in connection with the case. The second firm, by contrast, conducted all discovery, met with the plaintiff's doctors, prepared the case for trial, drafted a pre-trial order, opposed the defendant's pre-trial motions, researched and drafted a *voir dire* questionnaire, and settled the litigation. *Id.* at *3. The court determined that, on that record, the outgoing firm was entitled to 15% of the contingency fee. *Id.* at *6.

Finally, where outgoing counsel makes serious errors or performs nearly no substantive work in a matter, courts severely limit recovery of attorneys' fees. In *Brown v. Governele*, 29 A.D.3d 617 (N.Y. 2d Dep't 2006), the outgoing firm filed a deficient summons and complaint—which named the wrong defendant—never served the complaint, did no investigation, and obtained no records related to the matter. Br. for Appellant, 2005 WL 4716133, at *1; *see Brown*, 29 A.D.3d at 618. The incoming firm, however, "filed an amended summons and

complaint on behalf of the plaintiff, conducted discovery, successfully opposed a motion for summary judgment on the issue of the liability of [one] defendant . . . , and represented the plaintiff at mediation, which resulted in a settlement for the sum of $300,000." *Brown*, 29 A.D.3d at 618.  The Appellate Division modified the lower court's apportionment of fees to grant the outgoing firm 5%, and the incoming firm 95%, of the resulting attorneys' fee.  *Id.* at 617–18.  Finally, in *Poulas v. James Lenox House, Inc.*, 11 A.D.3d 332 (N.Y. 1st Dep't 2004), the outgoing firm "merely filed and served three-page summons and complaint in action and obtained some medical records during 11 months it served as plaintiff's attorney."  *Id.* at 332.  By contrast, the incoming firm "responded to defendants' discovery requests, conducted approximately 10 depositions, retained experts on liability and damages, conducted *voir dire*, engaged in settlement negotiations and secured a highly favorable settlement for plaintiff, whose injuries, although serious, were difficult to establish clinically."  *Id.* at 332–33.  The court concluded that the outgoing firm was entitled to just 3.33% of the resulting attorneys' fee, while the incoming firm was entitled to the remainder.  *Id.* at 332.

### C. Solicitation Allegations

Before arriving at the apportionment appropriate in this case, the Court considers BMS&P's allegations regarding the conduct of S&S, both as to S&S's initial investigation and contact with the plaintiff, and as to the plaintiff's decision to terminate his attorney–client relationship BMS&P and to hire S&S after the filing of the complaint.  The firm contends that the ethical questions raised by its allegations require that the Court "equitably estop[]" S&S from receiving any fees in this matter—with S&S's share to be remitted directly to the plaintiff[6]—or, in the alternative, that the Court order an evidentiary hearing to elicit further factual development

---

[6] The plaintiff has never indicated that he seeks such an award and, in light of the affidavits that he and his brother have filed, it might be inferred that he does not believe he is entitled to such an award.

regarding its allegations.  *See Pessoni v. Rabkin*, 220 A.D.2d 732, 732 (N.Y. 2d Dep't 1995) ("It is well settled that an attorney who engages in misconduct by violating the Disciplinary Rules is not entitled to legal fees for any services rendered." (alterations and internal quotation marks omitted)).  Principally, BMS&P contends that two aspects of S&S's conduct, as alleged by BMS&P, support the conclusion that S&S breached its ethical obligations:  First, BMS&P argues that S&S's initial contact with the plaintiff in the hospital, and particularly its $7,500 "donation" to the victim, violated Disciplinary Rule 2-103(D) of the New York Lawyer's Code of Professional Responsibility.  *See* BMS&P Reply at 1.  Second, BMS&P contends that S&S used, through its association with the plaintiff's fellow union members, "strong-arm tactics" that led to the change in representation, in violation of the prohibition against solicitation "involv[ing] coercion, duress or harassment" in D.R. 2-103(A)(2).  *See* BMS&P Mem. at 9.

Regarding the alleged "donation," S&S does not deny that a $7,500 payment was made to the family of the plaintiff while he recovered from his injuries in the hospital, or that the payment was made contemporaneously with S&S turning over the materials it had gathered in its initial investigation.  In his declaration attached to S&S's sur-reply on this motion, Kenneth Sacks explains that "[a]round the[e] time [that S&S turned over its investigation materials], I learned that Eric[ Borg's] coworkers were creating a fund to help support him and I made a donation to the fund."  Second Sacks Decl. at 2.  He states that "Emil [Borg] thanked me and told us the family would contact us if Eric wanted further help."  *Id.*  Those representations constitute the entirety of S&S's statements on the matter of the donation.

However, the Court is satisfied that those statements sufficiently explain the donation to remove the cloud of doubt that BMS&P casts upon it through its largely unsupported allegations. New York's D.R. 2-103(D) prohibits a lawyer from "compensat[ing] or giv[ing] anything of

value to a person . . . to recommend or obtain employment by a client." It seems likely that had S&S given the plaintiff money during his recovery in an attempt to win his representation, S&S would have been in violation of this rule. However, the Court is not aware of any piece of evidence that supports that charge here. BMS&P submits, in its affidavit supporting the instant motion, that the plaintiff's brother told Michael Barasch during their initial discussion regarding representation of the plaintiff that it was actually S&S which created the coworkers' fund. *See* Barasch E-mail. But the Court will not referee an exchange of allegations of attorney misconduct without something more than a self-reported telephone conversation as a foundation. Sack, by affidavit, has sworn that the plaintiff's "coworkers were creating a fund." While the Court has discretion as fact-finder to reject self-serving affidavits, *see Wagner & Wagner*, 596 F.3d at 91, in this case, the Court is faced with a self-serving affidavit from Sacks and a self-serving e-mail from Barasch. Even assuming the authenticity of the e-mail and its creation contemporaneous to the events, the Court is not in a position to conclude from the e-mail—and only that e-mail—that S&S acted unethically, or that any solid evidence supports such a claim. This is particularly so where, despite the alleged violation of the Rules, the plaintiff did not clearly hire S&S to represent him as a result. Indeed, the plaintiff waited three months after the donation was made before first hiring BMS&P.

Likewise, BMS&P's second allegation of impropriety—that S&S, through the plaintiff's fellow union members, impermissibly pressured the plaintiff to discharge BMS&P and hire S&S after the plaintiff's case was filed in federal court—is entirely based on speculation. BMS&P submits that when the plaintiff discharged it, he "explained that during the time [BMS&P] represented him he had received numerous calls from members of his union and from Sacks, urging him to reconsider his decision not to hire Sacks." Penson & Barasch Aff. at 17. It also

represents that, after being discharged, Michael Barasch contacted the plaintiff's brother, who told him that "members of Eric's union told Eric that if he refused to hire Sacks, the union would hurt his case, not help him." *Id.* at 18.  BMS&P further promises that it "stands ready to make ex parte disclosures to this court demonstrating that . . . discovery is not a fishing expedition but is based on a good-faith belief that the threatening behavior described by Emil Borg in this case is part and parcel of the way Sacks operates through union members."  Penson Reply Aff. at 5 n.6.

Though the allegation is troubling, the Court is not convinced that, regardless of whatever standard of evidence would give rise to the need for further discovery, such a threshold has been met here.  At bottom, BMS&P presents the Court with a rumor and an inference as to S&S's conduct, along with a vague allusion to evidence of an ongoing and improper alliance between S&S and the plaintiff's union.  The Court will not exercise its ancillary jurisdiction over this fee dispute to further inquire into a factual scenario best—and, arguably, exclusively—left to New York's attorney–grievance procedure. *See Erdmann v. Stevens*, 458 F.2d 1205, 1209 (2d Cir. 1972) ("[T]he Appellate Division of each judicial department in [New York] is given the exclusive power to resolve issues as to alleged misconduct of attorneys practicing within its jurisdiction."); *see also* N.Y. Judiciary Law §§ 90(1)–(2).

The Court has no desire to reward wrongdoing, and it is mindful of its duty here to resolve the fee dispute equitably.  Had BMS&P presented factual submissions to support its allegations, the Court might have determined that such facts gave rise to the need to hold an evidentiary hearing and, perhaps, to disqualify S&S from receiving any fees pursuant to the settlement.  But to require a hearing here would suggest that such a hearing should be granted when any discontented attorney merely affirms that he or she believed another attorney to have

committed unethical conduct in a representation, even when—as here—based on hearsay alone.[7]
To the contrary, the Court will not become a venue in which to air and litigate the
"unsubstantiated accusations of a disappointed [attorney]," and here the material provided to the
Court is "insufficient to create an issue of fact which would necessitate a hearing," *Shelton v.
Shelton*, 151 A.D.2d 659, 659 (N.Y. 2d Dep't 1989); *see Poli v. Gara*, 117 A.D.2d 786, 788
(N.Y. 2d Dep't 1986) (holding that a "substantial issue of fact" may require the need for a
hearing into attorney misconduct).  Finally, the Court notes that, should the grievance procedure
eventually yield the conclusion that S&S did, in fact, behave improperly in this action and
therefore must relinquish the fees it earned through its contingent-fee agreement, the Court will
be inclined to exercise its ancillary jurisdiction over the matter once again.

## CONCLUSION

The Court's consideration of the factors relevant in the instant inquiry establishes that
S&S conducted the vast majority of the substantive legal work in this case, including all
discovery and settlement discussions, and that the factors strongly favor S&S here.  Furthermore,
the cases discussed by the firms and the Court establish that outgoing law firms in personal-
injury cases that perform little substantive work at the outset of a case rarely receive a significant
percentage of the ultimate attorneys' fee.  The Court finds the amount of work performed by
BMS&P—which conducted no discovery and did not interact at all with defense counsel, but did
file a complaint that was never amended and led, in part, to a successful settlement—in this
matter to be comparable to the work performed by the outgoing firms in *Buchta* and *Cruz*—firms
that received 10% and 15% of the total contingency fee, respectively.  Furthermore, the Court
does not rate BMS&P's work to be at the low level as that provided by the outgoing firms in

---

[7] If the hallmark of hearsay is its inherent unreliability, it seems to the Court that hearsay in the context of a change
in representation for a large personal-injury contingent-fee case would be even more unreliable.

*Brown* (in which, among other problems, an erroneous complaint was filed) and *Poulas* (in which the outgoing firm merely filed a three-page summons and complaint); those firms received, respectively, 5% and 3.33% of the ultimate attorneys' fee.  The Court therefore determines that, here, S&S is entitled to 92% of the attorneys' fees earned in the matter—or $3,526,666.00—and BMS&P is entitled to 8%—or $306,667.00.


**SO ORDERED.**

Dated: New York, New York
      January 24, 2012

Richard J. Holwell
United States District Judge